UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Yakov Trakhtenberg, formerly
known as Jacob Trakhtenberg,

       Plaintiff,

v.                                                                  Case No. 14-13854

Oakland County, *et al.*,                            Sean F. Cox
                                                                        United States District Court Judge

       Defendants.
_____/

**OPINION & ORDER
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff filed this action, asserting § 1983 claims and state-law claims against four

named Defendants:  1) Defendant Terry Cashman, a detective with the Oakland County's

Sheriff's Department; 2) Sheriff Michael Bouchard; 3) the Oakland County Sheriff's

Department; and 4) Oakland County.  Plaintiff's claims arise out of a criminal investigation and

prosecution of Plaintiff for criminal sexual conduct charges involving his daughter, who was

eight years old at the time.

The matter is currently before the Court on the following two motions: 1) Defendant

Cashman's Motion for Summary Judgment; and 2) a Motion for Summary Judgment filed by the

remaining Defendants.  The parties have extensively briefed the issues and the Court heard oral

argument on October 15, 2015.  For the reasons set forth below, the Court shall GRANT

summary judgment in favor of Defendants as to all fifteen counts of Plaintiff's Complaint.

**BACKGROUND**

1

Plaintiff Yakov Trakhtenberg, formerly known as Jacob Trakhtenberg ("Plaintiff"), filed this action against Defendants in state court and Defendants removed it to this Court based upon federal-question jurisdiction over Plaintiff's § 1983 claims.

Plaintiff's complaint asserts claims against the following four named Defendants: 1) Oakland County; 2) the Oakland County Sheriff's Department; 3) Sheriff Michael J. Bouchard; and 4) Detective Terry Cashman. Defendants Bouchard and Cashman are sued in their individual and official capacities. Plaintiff's complaint asserts the following 15 counts:

1) "42 U.S.C. § 1983 False Arrest" (Count I);

2) "42 U.S.C. § 1983 False Imprisonment (Count II);

3) "42 U.S.C. § 1983 Malicious Prosecution" (Count III);

4) "42 U.S.C. § 1983 Municipal Liability" (Count IV);

5) "42 U.S.C. § 1983 Supervisor Liability" (Count V);

6) "42 U.S.C. § 1983 Punitive Damages Individual Defendants" (Count VI);

7) "42 U.S.C. § 1983 Punitive Damages Individual Defendants" (Count VII);

8) "42 U.S.C. § 1983 Monell Claim against Defendant Oakland County and Oakland County Sheriff's Department" (Count VIII);

9) "Violation of Article 1 § 17 of the Michigan Constitution" (Count IX);

10) "Michigan False Arrest and False Imprisonment Claim" (Count X);

11) "Michigan Malicious Prosecution Claim" (Count XI);

12) "Michigan Intentional Infliction of Emotional Distress Claim" (Count XII);

13) "Gross Negligence" (Count XIII);

14) "Abuse of Process" (Count XIV); and

15)     "Claims for Damages and Jury Demand" (Count XV);

(Pl.'s Compl.).

Following the close of discovery, Defendants filed the following summary judgment motions: 1) a Motion for Summary Judgment filed by Defendant Cashman; and 2) a Motion for Summary Judgment filed by the remaining Defendants.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3).

In compliance with this Court's guidelines, in support of their Motions for Summary Judgment, Defendants filed a "Statement of Material Facts Not In Dispute" (Docket Entry No. 38) ("Defs.' Stmt.). In response to that submission, Plaintiff filed a "Counter-Statement of Disputed Facts" (D.E. No. 43) (Pl.'s Ctr. Stmt.").

The following material facts are gleaned from the evidence submitted by the parties,

3

viewed in the light most favorable to Plaintiff, the non-moving party.

The instant action relates to the criminal investigation and prosecution of Plaintiff in regard to charges of criminal sexual conduct.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 1).

Before describing the actual events as they unfolded, the Court includes here a section relating to a Michigan statute and protocols developed for use in investigations involving child abuse, as they are relevant to Plaintiff's claims in this case.

### Michigan's Child Protection Law

Michigan's Child Protection Law, Mich. Comp. Laws § 722.621 *et seq*., requires persons who have reasonable cause to suspect child abuse or neglect to immediately make a report of such suspected abuse of neglect.  *Roscrans v. Kingon*, 154 Mich. App. 381, 320 (1986).  Failure to do so can result in civil liability.  *Id*.; Mich. Comp. Laws § 722.633.

Plaintiff's briefs cite two subsections of another section of the act, Mich. Comp. Laws § 722.628, subsections (4) and (6).  Section 722.628 is titled "Investigations" and provides that reports of child abuse or neglect must be investigated promptly.  The two subsections that Plaintiff focuses on provide:

> (4) Law enforcement officials shall cooperate with the department in conducting investigations under subsections (1) and (3) and shall comply with sections 5 and 7. The department and *law enforcement officials shall conduct investigations in compliance with the protocols adopted and implemented as required by subsection (6).*
> . . . .
>
> (6) In each county, the prosecuting attorney and the department shall develop and establish procedures for involving law enforcement officials as provided in this section. *In each county, the prosecuting attorney and the department shall adopt and implement standard child abuse and neglect investigation and interview protocols using as a model the protocols developed by the governor's task force on children's justice* as published in FIA Publication 794 (revised 8-98) and FIA Publication 779 (8-98), or an updated version of those publications.

4

Mich. Comp. Laws § 722.628(4) & (6) (emphasis added).

The State of Michigan Governor's Task Force on Children's Justice and Family

Independence Agency Forensic Interviewing Protocol ("the Governor's Task Force Protocol") is

attached as Docket Entry No. 35-6.   It includes the following:

> There are two overriding features of a forensic interview (Poole & Lamb, 1998).  First, forensic interviews are hypothesis-testing rather than hypothesis-confirming (Ceci & Bruck, 1995).  Interviewers prepare by generating a set of alternative hypotheses about the sources and meaning of the allegations.  During an interview, interviewers attempt to rule out alternative explanations for the allegations.
> . . . .
>
> Second, forensic interviews should be child-centered.  Although interviewers direct the flow of conversation through a series of phases, children should determine the vocabulary and specific content of the conversation as much as possible.  Forensic interviewers should avoid suggesting events that have not been mentioned by the child or projecting adult interpretations onto situations (e.g., with comments such as, "that must have been frightening.")
>
> There are no fixed guidelines about how much information interviewers should gather before meeting with a child. . . . The National Center for Prosecution of Child Abuse, the American Prosecutor's Research Institute, and the National District Attorney's Association (1993) concluded, "Interviewing a child without knowing any of the details revealed to another as analogous to performing a medical examination without knowing the patient's history or looking for an unfamiliar destination without a road map."
>
> Pre-interview preparation will vary depending upon the nature of the allegations, the available resources, and the amount of time before an interview must be conducted.  It is important to collect background material . . .  when factors such as medical treatment or family hostilities might complicate the investigation.
> . . . .
> The following list of topics illustrates the types of information that might be useful for interviews about child sexual abuse allegations[:]
>
> - Child's name, age, sex, and relevant developmental or cultural considerations (e.g., developmental delay, hearing or speech impairment, bilingualism)
> . . . .
> -Family composition/custody arrangements
> -Family members' and relevant friends' or caretakers' names
> . . . .

5

- Relevant medical treatment or conditions (e.g., genital rashes[ ])
. . . .
- Family habit or events related to allegation issues . . .
. . . .
- Possible motivations for false allegations (e.g., family or neighborhood
hostilities that predate suspicions of inappropriate behavior).
. . . .
Individuals who might be accused of influencing the child to discuss abuse, such
as parents involved in custody disputes or therapists, should not be allowed to sit
with the child during the interview.
. . . .
      The best environment for conducting forensic interviews is a center
specifically equipped for this purpose.
      Interviewers who do not have access to an interviewing facility should try
to arrange a physical setting that recreates some of the important features of
specialized centers. . .  Interviews should not be conducted in a child's home.  A
child may be intimidated because his/her parents are in the home and the neglect
or abuse may be taking place there.  If the interview must be conducted in the
home (child is preschool age, child is on school break, etc.), select a private
location in the home for the interview that is away from parents or siblings and
appears to be the most neutral spot.

(*Id.*).

**Oakland County's Protocol**

Oakland County has adopted the Oakland County Child Sexual Abuse Investigative

Protocol ("Oakland's Protocol").  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 1; Defs.' Ex. N).  Oakland

County's Protocol states, in pertinent part:

Oakland County Child Sexual Abuse Investigative Protocol

If you have opened this document, you have already identified yourself as a
professional committed to safety and justice for all child abuse victims.  The
protocol is a countywide collaborative effort to outline and establish the best
practices for communicating with professionals dedicated to the mission of
keeping children safe.  The protocol outlines a coordinated approach for Oakland
County professionals involved in child protection to act as a mutlidisciplinary
team in cases of sexual and severe physical abuse.  This protocol is to be used in
the investigation of child sexual and severe physical abuse cases.  It is not an
exhaustive list of every investigative activity that may be available. Children's
safety is a priority for all professionals involved, and a team approach allows for

the best outcome possible for the child.

. . . .

    4.      Law enforcement officials shall cooperate with the defendant in conducting investigations . . . The department and law enforcement officials shall conduct investigations in compliance with the protocols adopted and implemented as required by subsection (6).

. . . .

    6.      In each county, the prosecuting attorney and the department shall develop and establish procedures for involving law enforcement officials as provided in this section.  In each county, the prosecuting attorney and the department shall adopt and implement standard child abuse and neglect investigation and interview protocols using as a model the protocols developed by the governor's task force on children's justice as published in FIA Publication 794 (revised 8-98) and FIA Publication 779 (8-98), or an updated version of those publications.

. . . .

B.      Coordinated Investigative Teams (CITs)

    1.      Each member of the team should have received specialized training in the handling of abuse and neglect cases, and have knowledge regarding the Michigan Forensic Interviewing Protocol.  (See Appendix A.)

    2.      The team may include, but it not limited to, the following individuals:

          a.      Prosecuting Attorney

          b.      Police Investigators (investigative team)

          c.      Family Independence Agency Children's Service Worker (FIA)

          d.       Medical Health Professionals

          f.      School Personnel

          g.      CARE House representative

. . . .

C.      Investigative Objectives

    1.      Determine if the child was abused or neglected by a person responsible for the child's health or welfare and whether the child is in need of protection;

. . . .

    5.      Ensure fairness to the accused.

. . . .

H.      Police investigators shall check collateral sources of information including but not limited to:

    1.      FIA files (PSMIS/CIMS)

    2.      CLEMIS

     3.      Computerized criminal histories (LEIN)
     4.      Medical personnel involved
     5.      Living together partners and relatives who have cared for the child
     6.      Other persons with access to the child including but not limited to day care providers and babysitters
     7.      School personnel including social workers and school records
     8.      Friend of the Court information
     9.      Probate and Circuit Court records
     10.    Former spouse or partner
     11.    Neighbors

. . . .

     2.      Conducing the forensic interview of the child.
          d.     A trained Forensic Interviewer must conduct the child interview according to the State of Michigan Protocol. Please see attachment.

(*Id.*). Oakland County's Protocol includes an "Appendix A Forensic Interviewing Protocol" that consists of a copy of the Governor's Task Force Protocol. (Defs.' Ex. N).

**The Criminal Investigation Here**

At all relevant times, Detective Terry Cashman has been employed by the Oakland County Sheriff's Department.

Prior to the criminal investigation at issue in this case, Detective Cashman was one of the officers who had responded to several calls that Plaintiff made to the Oakland County Sheriff's Department, asserting that his then-wife, Liliya Tatarly, had assaulted him. (Cashman Dep. at 40). Those events occurred in the 1998-1999 time period. (*Id.; see also* Cashman Report at OC 9). Cashman believed Plaintiff was making false police reports because every time he responded to the calls he found no evidence of a physical assault on Plaintiff. (*Id.*). Cashman admits that he hold Plaintiff, back in May of 1999, to stop making those calls because Cashman believed that Plaintiff was lying about the alleged assaults by Tatarly. (Cashman Dep. at 40).

Detective Cashman was the only substation detective at his assigned post at the time of

the criminal investigation involving Plaintiff. (Cashman Dep. at 107). Cashman was the officer in charge of Plaintiff's case. (Cashman Dep. at 100). At the time of the events at issue, Cashman had not received specialized training in investigating child abuse cases. (*Id.* at 107). Cashman had not received training with respect to, and was not aware of, the Governor's Task Force Protocol. (*Id.* at 100-101 & 110). Cashman also had not received training as to Oakland County's Protocol. (*Id.* at 91).

The criminal investigation of Plaintiff began as a result of allegations of sexual misconduct reported by Plaintiff's former wife, Liliya Tatarly, to Family Independence Agency (i.e., Department of Human Services) in regard to their then eight-year-old daughter, "RT." (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 2; *see also* Ex. A to Defs.' Br., Family Independence Agency Report). Tatarly reported the alleged sexual abuse on March 11, 2005. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 3).

The Family Independence Agency Report states that: 1) Taterly reported that RT had asked her if she could keep a secret; 2) RT then informed her mother that when she was at Plaintiff's house, she was cold at night and went into Plaintiff's bedroom; 3) Plaintiff told RT to get in bed with him to warm up; 4) when RT got in bed with Plaintiff, Plaintiff took her hand and put it "on his front private area" and 5) RT told her mother that Plaintiff's private area felt "gooey." (Defs.' Ex. A).

As a result of RT's allegations, a forensic interview was conducted by Amy Allen at CARE House on March 15, 2005. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 10). Allen filled out a written report. (Defs.' Ex. C). The first page of the report includes a summary of the interview that states that: "Child made statements that suspect had her touch his private spot with her hand

9

2x," "Child stated that she did this when in bed with suspect and he took her hand down to his private spot," "Child stated that it happened both times in Dec. 2004," and "Child stated that suspect said 'lower, lower' when he moved her hand until her hand was touching." (*Id.* at 1). That report also contains a handwritten paragraph:

> Child stated that she came to talk about dad's house. Quote, scared, worried, and frightened. States he hits her brother. And when they turn 13, they can choose where to live to the judge. She will be with mom. States dad has pulled her ear and it hurts. States good thing no earrings in. Child states her bed and bedroom are very cold. If she goes to his bed, he puts her hand on his private spot. Says he has done this two times. States he said lower, lower, and her hand was touching her dad's private spot. And it felt like gushy balls. Child states she tries to carefully take hand away when he falls asleep so he doesn't notice. States dad has never said anything about it. She just decided to keep it a secret. . .

(*Id*. at 2; Allen Dep. at 87-88). Allen testified that her written report accurately reflects what was said during the interview. (Allen Dep. at 89). The report also states, in handwriting:

> Alt. Hypothesis:
> - accidental touch
> - wrong suspect
> - custody issues

(*Id*. at 2). The report states "interview suspect and offer poly" as an action step and indicates the person responsible for that as "Det Cashman." (*Id*.).

Subsequent to the CARE House interview, on March 18, 2015, Detective Cashman of the Oakland County Sheriff's Office and FIA employee Cleo Spates met with RT and her mother. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 17). Spates conducted a forensic interview of RT. (Defs.' Ex. A; Spates Dep. at 14). Following that forensic interview, Spates filled out a report stating:

> In Forensic Interview with [RT] the following was revealed:
> [RT] presented as being competent for the interview, she was articulate and open to discussing the incidents with CPS and Det. Cashman from OCSD. [RT] stated that she no longer wanted to have visits with her father. She stated that her father had made her touch his private parts in the front and it was gooey when her hand

10

touched it. She stated that the incident had only happened the one time.  When [RT] was informed that her visits with her father were suspended for a while, she started jumping up and down and said Yeah! . . .

(Defs.' Ex. A at Pg ID 1999).

Plaintiff contends that Spates did not conduct that forensic interview pursuant to requisite protocols.  (Pl.'s Ctr. Stmt. at ¶ 19).

On March 21, 2005, Spates interviewed Plaintiff at his residence.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 23).  Cashman was present with Spates during this interview with Plaintiff. (Spates Dep. at 16).  During the interview, Plaintiff stated that recently RT had been coming into his bedroom at night complaining of stomachaches and telling him she cannot sleep because it is cold.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 24(A)).  Plaintiff stated that after RT got into his bed he rubbed her stomach and while he was rubbing her stomach he put his hand into her panties and with his hand he pushed down three times on top of her vagina.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 24(C); Spates Dep. at 15).  Plaintiff stated that he had learned this from his mother and grandmother in Russia.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 24(D)).  According to Plaintiff, if a girl reacts violently in response, then she is sick.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 24(E)).

Spates testified that, during her interview with Plaintiff, Plaintiff attempted to touch her vagina in order to show how he had touched RT:

A.    I don't specifically recall that.  I do recall Mr. Trakhtenberg attempting to touch me to show me how he had touched his daughter's genitalia.
Q.    Tell me about that.
A.    I was standing, as I generally do when I'm conducting an interview of parents or children, and he approached me, came into my personal space with his hand out reached, reaching for my private parts.
Q.    Your vagina?
A.    My vagina, yes.
Q.    And did you stop him?
A.    I backed up.  I put my hand out and told him that was not necessary,

11

please not to touch me.

(Spates Dep. at 17; *see also* Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 27-29).  Spates testified that

Plaintiff's action did not influence her decision, because her decision to take action was already

made based upon Plaintiff's statements, but that his behavior appeared to be that of someone

who did not understand boundaries.  (Spates Dep. at 18).

Plaintiff also told Spates that he took RT's hand and rubbed it on his own stomach, but he

did not put her hands inside of his pajama bottoms.  (Spates Dep. at 15).

Spates testified that she found Plaintiff's recitation of what had occurred with RT to be

"alarming."  (Spates Dep. at 15).  Spates testified that, despite having investigated child sexual

abuse since 1999, she had never heard an individual needing to touch a child's vagina due to a

stomachache.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 26; Spates Dep. at 75).

After Spates's interview of Plaintiff, Spates filed a Complaint and Petition to Terminate

Plaintiff's parental rights.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 31; Defs.' Ex. E).  That Petition

and Complaint referenced statements made by RT and by Plaintiff.

Spates testified that she filed the Petition because there was nothing in Plaintiff's

statements to her that led her to believe that there was a rationale for Plaintiff having touched

RT's vagina.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 34).  Spates testified that she filed the Petition

because there was a "preponderance of the evidence" to support a finding of abuse and that she

did not need to wait to speak with RT prior to filing a Petition because Plaintiff own statements

were sufficient.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 35-36; *see also* Defs.' Ex. D).

Cashman arrested Plaintiff on March 21, 2005, the day he was interviewed, on an

outstanding bench warrant.  (*See* Pl.'s Br. at 12; Cashman's Police Report, Pl.'s Ex. F at OC 10,

stating "I advised him that there was a bench warrant for his arrest from FOC and that I would have to take him into custody (Dispatch had previously confirmed) which he complied with."). The bench warrant at issue was provided as Exhibit A to Cashman's Reply Brief. It was issued by a judge with the Oakland Judge Circuit Court and was provided to the Friend of the Court Unit on November 18, 2002. It identifies Plaintiff by name and includes his address, date of birth, and social security number. It orders the arrest of Jacob Trakhtenberg and states:

> Bring him/her before the Court immediately, or he/she may be released when a cash bond is posted in the amount of $1500.00 for personal appearance before the Court at its next session.

> Current total arrearages on record at the Friend of the Court and the estimated costs associated with failure to appear are: $1,831.84.

(*Id*.).

Cashman's report states that Plaintiff "went on repeatedly complaining about the warrant and that it was probably on his ex-wife. I replied maybe so but that he was still going to have to see Judge Alexander tomorrow to straighten it out. Jacob was then transported and lodged at OCJ on the FOC warrant (05-26322)." (Ex. F. at OC11).

On March 22, 2005, Cashman called Tatarly. (*See* Cashman's Report, Def.'s Ex. B, at OC 12). Cashman's report states "I asked Liliya if she would ask [RT] if there were any incidents of her father touching any of her private parts with his finger as she had not mentioned that at the Carehouse interview. Liliya said she would when [RT] got home from school." (*Id*.). Cashman's report states that on March 24, 2005, he:

> returned a call to Liliya with Liliya telling me that she asked [RT] if her father had ever touched [her] on any of her private parts with his fingers. [RT] said yes that her Father had touched her at least two separate times with his finger on her vagina. I asked Liliya why [RT] had not revealed this at the Carehouse interview. Liliya said she asked [RT] this and [RT] said she didn't tell them because she

13

> though she could only say what she thought she had done wrong not what her
> Father had done wrong to her. [RT] said that on certain visits she did have a
> stomach ache but not as much as Jacob was alleging.  I asked Liliya if [I] could
> stop by at the beginning of next week to talk with [RT] about this and she replied
> yes at anytime as [RT] was school break all next week.

(*Id.*).  Cashman also testified that Tatarly called him and that she said that RT told her that her

father touched her vagina at least two times.  (Cashman Dep. at 62-63).

On March 29, 2005, Cashman and Spates met with RT at Tatarly's residence.  (Defs.'

Stmt. & Pl.'s Ctr. Stmt. at ¶ 41).  Cashman testified that the purpose of this second interview was

to discuss the additional information that had been received from Plaintiff, and see if RT

confirmed or denied it.  (Cashman Dep. at 130).  The parties dispute whether or not Spates was

the lead interviewer of RT during this interview.  In any event, Cashman's report states, in

pertinent part:

> When we told [RT] we just wanted to ask a few questions about the number of
> times she was touched inappropriately and when it happened.  Also her Father
> had brought up about he touching [RT's] vagina and we wanted to ask her if this
> happened.
> First I asked [RT] did her father ever touch her private part down in her pants
> with his hands and she said yes.  I asked if she knew what that was called and she
> said vagina.  I asked why she did not reveal this at the Carehouse.  [RT] said she
> was confused at the Carehouse interview and thought that she only suppose to say
> when her Father made her touch him, not when he touched her.  I asked about
> how many times this happened and she said she remembers twice.  I asked did her
> Father touch her with one finger or more and [RT] replied that he touched with
> just one finger and when I showed her my right index finger she nodded and said
> that was the one.

(*Id.*).  As to this portion of the interview with RT, Cashman testified as follows:

> Q.   When you asked [RT] about which finger her father used and held up your
>       index finger before she could answer – the right index finger, was that
>       suggestive, do you think?
> A.   No, I don't think so.
> Q.   You don't think that was suggesting an answer?
> A.   No.  She wouldn't answer right away.  She was looking down and I was

> just trying to get it done as quick as possible and get out of there.
>
> Q. So she did not answer and then you held up a finger – sir, she did not answer, then you held up your finger and then she said that was the finger?
>
> A. She did answer, but she said a finger, but she didn't show me which finger. She said – and I asked her how many and she it was a finger, but she didn't show me. So that's when I went like this and I said is this the finger or not, and she yes, it was.
>
> MR. POTTER: The record should reflect, he just held up a hand, his right hand, with his right index finger.
>
> A. Right index finger.

(Cashman Dep. at 144-45).

Consistent with Cashman's report, Spates testified that, during the interview, RT revealed that her father had touched her vagina. (Spates Dep. at 56). Spates further testified that RT stated that she had not mentioned that before because she thought she was only supposed to tell what her father made her do to him. (Spates Dep. at 18; *see also* Cashman Dep. at 63 & 68).

Subsequent to the interview of RT by Cashman and Spates, Cashman sought a warrant from the Oakland County Prosecutor's Office for five charges of Criminal Sexual Conduct in the second degree against Plaintiff. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 45). In connection with that request, Cashman provided the prosecutor's office with his report and with the Family Independence Agency Report. (Jansson Dep. at 118).

On April 5, 2005, Sydney Turner of the Oakland County Prosecutor's Office signed the Complaint and request for warrant. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 46). It listed Cashman as the complaining witness in the caption. It also listed Tatarly, RT, Allen, Spates, and Sgt. A. Spencer as witnesses.

On April 13, 2005, Magistrate Balian of the 52-3 District Court executed a warrant for Plaintiff's arrest on CSC charges. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 47).

15

Plaintiff waived his right to a preliminary examination and the charges filed against him were bound over to Oakland County Circuit Court.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 48).  Plaintiff waived his right to a jury trial and, on January 19, 2006, he proceeded to a bench trial before Judge Deborah Tyner.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶¶ 49-50).

Plaintiff testified at trial that he had made some admissions to the police officers about touching RT's vagina:

> Q.    Okay.  Let's move on to the touching of her vagina.  You – you have made admission to the police officers, in the police report, that at least on three occasions you have touched her on the vagina; is that correct?
> A.    Yes.
> Q.    And we have testimony that these incidences may have occurred over a visitation weekend in December of '04 and in January of '05; is that correct?
> A.    Yes.

(Defs.' Ex. J at 29).  Plaintiff also testified at trial that: 1) he applied ointment to RT's vagina six times over the course of one weekend; 2) he allegedly applied the ointment at the request of his ex-wife; 3) in response to RT's complaint of a stomachache he unzipped her (RT's) pajamas, placed one finger on the top of her vagina and pushed down; 4) he then asked RT whether she felt any pain; 5) he pushed down on RT's vagina with his finger because it is what his mother taught him to do in Russia.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 51).  Plaintiff denied forcing RT to touch his penis.  (*Id.*).

RT testified at trial that: 1) she would sleep in Plaintiff's bed because her room was cold and the dolls in her room scared her during the night; 2) when she was in Plaintiff's bed, he would ask her to rub his stomach; 3) Plaintiff would then take her and push it lower; 4) she attempted to take her hand away but Plaintiff was too strong; 5) Plaintiff's genitalia felt like a "gushy ball"; 6) Plaintiff made her touch his genitalia three or four times; 7) Plaintiff touched her

16

"private part" on two occasions; 8) when Plaintiff touched her, she was in his bed; and 9) she

wore "onesy" pajamas and Plaintiff unzipped the pajamas in order to touch her.  (Defs.' Stmt. &

Pl.'s Ctr. Stmt. at ¶ 52).

Cashman testified at trial that: 1) Plaintiff told him that he had touched RT's vagina on

multiple occasions; 2) Plaintiff told him that he (Plaintiff) touched RT's vagina after rubbing her

stomach; and 3) he did not recall Plaintiff ever referencing applying ointment to RT's vagina.

(Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 53).

At the conclusion of the proofs, the Court convicted Plaintiff of three of the five counts of

Criminal Sexual Conduct, second degree.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 55).  The Court

found Plaintiff guilty of two counts of Plaintiff touching RT.(Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶

56).  The Court stated:

> I don't find his testimony about the ointment credible at all, mainly because of the
> major inconsistency in regard to the rebuttal witness's testimony that he was
> never asked to apply the ointment.  And that her yeast infections did not occur
> around the time in which allegedly these incidents occurred, late '04, beginning of
> '05.

(Defs.' Ex. J, Trial Court Tr., at 61).  The Court also found Plaintiff guilty of one count of

Plaintiff forcing RT to touch his genitalia.  (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 57).  The Court

stated:

> I do find her [RT's] testimony credible when it was described in detail like a
> gushy ball.  That is not something a child would fabricate.
> . . . .
> she went on to explain how he had her – he pushed her hand down, so – to her
> vaginal area.  That can be for nothing other than – that can be for nothing other
> than sexual – let me get this.  Just one moment.
> Then he would lower her hand down to his genital area is what I meant to say.
> That can be for nothing other than sexual pleasure.

 (Defs.' Ex. J at 61-62).

17

Plaintiff was sentenced to prison for four to fifteen years for each of the three counts of which he was convicted. Plaintiff's sentences were concurrent. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 58).

**Criminal Appeal And Additional Proceedings In The State Court**

On March 27, 2007, the Michigan Court of Appeals affirmed Plaintiff's convictions. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 59). On September 10, 2017, the Michigan Supreme Court denied Plaintiff's Application for Leave to Appeal. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 60).

On December 16, 2008, Plaintiff filed a Motion for Relief from Judgment in Oakland County Circuit Court. The Michigan Court of Appeals denied Plaintiff's Application for Leave to Appeal the trial court's denial of that motion. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 61-62). But on March 31, 201, the Michigan Supreme Court remanded to the trial court for a *Ginther* hearing. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 63).

The trial court held the *Ginther* hearing in August of 2010. During that hearing, Plaintiff again testified under oath that he touched RT's genital area on three (3) occasions. At the conclusion of the hearing, the trial court granted Plaintiff's Motion for Relief from Judgment based on ineffective assistance of counsel. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 64-66).

After the Michigan Court of Appeals reversed the trial court's order granting Plaintiff's motion, on December 21, 2012, the Michigan Supreme Court remanded for a new trial on the basis that Plaintiff's criminal defense attorney was ineffective. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 67-68). It is undisputed that the Michigan Supreme Court's decision to remand for new trial was not based on sufficiency of the evidence. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 69).

On May 15, 2013, the Oakland County Prosecutor's Office filed a Petition to Nolle

Prosequi the charges against Plaintiff. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 70). That Petition stated that the Oakland County Prosecutor moves the Court for an order to Nolle Prosequi the action for the following reasons:

1.   The Defendant is charged with three counts of Criminal Sexual Conduct-Second Degree.
2.   The Defendant was previously tried and convicted of the above charges. After Defendant's conviction, he served a prison sentence in the Michigan Department of Corrections and was paroled in November 2012.
3.   While the Defendant was on parole, the Michigan Supreme Court overturned his convictions citing ineffective assistance of his trial counsel and remanded the case back to the Oakland County Circuit Court for a new trial.
4.   The child victim and her mother do not want to prosecute the Defendant again due to the stress of a trial and due to the substantial negative emotional feelings that would be reopened by continuing to trial.
5.   The interest of justice can best be served by dismissing this cause by an Order of Nolle Prosequi.

(Defs.' Ex. L.).

In this action, Chief Assistant Prosecutor Paul Walton, who at the relevant times served as an Assistant Prosecutor with Oakland County, filed an Affidavit. (Defs.' Ex. M). Walton's Affidavit states that the Oakland County Prosecutor's Office filed the Petition for Nolle Prosequi the charges against Plaintiff because: 1) the victim and her mother expressed a desire not to re-prosecute Plaintiff due to the stress of another trial and due to the substantial negative emotional feelings that would be reopened by continuing to trial; and 2) because Plaintiff had "already served more than the minimum sentence (4 years) and thus there was no guarantee that a second conviction would result in a sentence of additional jail time." (*Id*.). Walton's Affidavit states that the decision was not based upon any concerns with probable cause of the investigation conducted by Cashman and that the office believes that probable cause still exists as to whether Plaintiff committed criminal sexual conduct in the second degree against RT.

19

It is undisputed that Bouchard did not have any involvement nor personal knowledge regarding the criminal investigation at issue or Plaintiff's criminal prosecution. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 84).

**Testimony Concerning Cashman's Failure To Follow Protocols**

Plaintiff contends that Cashman, during the course of his investigation, failed to follow both the Governor's Task Force Protocol and Oakland County's Protocol. Plaintiff claims Cashman failed to follow the protocols by: 1) by asking RT's mother to ask RT about Plaintiff having touched RT's vagina (as opposed to an investigative team member doing that); 2) by conducting a second interview of RT at Tatarly's residence (as opposed to a forensic interviewing center like Carehouse); and 3) by holding up his right index finger, while asking RT to tell him which finger Plaintiff used to touch her vagina (which could be construed as suggesting an answer).

During discovery, after having been provided with the protocols, Cashman testified that his having directed Tatarly to ask RT if Plaintiff had touched her vagina was in conflict with the protocols. (Cashman Dep. at 155-56).

During discovery in this case, Amy Allen gave testimony that supports Plaintiff's position that the above actions taken by Cashman during the course of his investigation did not comport with the Governor's Task Force Protocol or Oakland County's Protocol. Allen testified as follows:

> Q. If they had told you that they were going to do it, do an interview of Rachel at her home, would have you recommended against it?
>       MR. WILLIAMS: Object to form, calls for speculation.
> A. More than likely, yes.
> Q. Would you ever call a parent and ask them to ask the child if they had been abused in a specific manner that the child had never disclosed?

A.     No.

Q.     Why not?

> MR. CLARK: Foundation.

BY MR. ELLIOTT:

Q.     Go ahead.

A.     First of all, you would never put a parent in the role of investigator. And it wouldn't be appropriate for that question to be asked by a parent out of the presence of investigators. It's not preferred at all.

Q.     And why is that?

A.     Again, there's a lot of reasons. One of them being that the investigation should be streamlined by the – a neutral party should be the one that's doing the investigation. And it should be an investigative – if it's needed for investigation, it should be an investigator.

Q.     And if charges are going to be brought, it needs to be a forensic interview, correct?

A.     That is the protocol and that's what's recommended.

Q.     If a person – if the person's question was what finger did someone touch you with, if the child didn't answer and someone held up a specific finger, would that be suggestive?

> MR. CLARK: Form and foundation.

Q.     Without any background in terms of what has already been discussed, that's hard for me to weigh in on.

BY MR. ELLIOTT:

Q.     If a child had never said that until the detective called her mother and asked her to find out if she was ever touched, never said anything. If the detective comes and meets her at her home and says what finger were you touched with. And if she was not responding, and the detective then went like this and held up his index finger, would that be suggestive to her, do you think?

> MR. CLARK: Form and foundation.

A.     Yes.

BY MR. ELLIOTT:

Q.     And that's in your expert opinion, correct?

A.     Yes.

(Allen Dep. at - 31; *see also* Allen Dep. at 55 & 99).

Plaintiff hired Katherine Okla, Ph D., who claims to be an expert regarding issues of forensic interviewing techniques. (Okla Dep. at 29). Plaintiff provided only a few pages of her

21

deposition transcript to the Court.  Without providing the page that contains the full question posed to her, Plaintiff directs the Court to the following testimony from Okla:

> issues you have taken or the problems you have had with the interview that Detective Cashman conducted, the background information and the whole investigation by Oakland County Sheriff Department, as well as Amy Allen's interview.  Could have R[T], a child of under eight at the time, developed permanent taint in this case?
>
>                    MR. POTTER: Object to speculation.  Go ahead.
> A.     Well, I would disagree it's speculation.  Based on decades of research around the world, it's not that she could have.  It's highly likely that she has had her memory altered.  It's not hard to do.

(Okla Dep. at 107).

It is undisputed that Cashman was not reprimanded by the Oakland County Sheriff's Department for violating any policies or failing to follow protocols in relation to his investigation of Plaintiff.  (Cashman Dep. at 86).

**Cashman's Testimony Concerning "Bad Guy" Note On A Document**

In responding to Defendant Cashman's Motion for Summary Judgment, Plaintiff asserts that "Cashman's police report" "contained a document with Mr. Trakhtenberg's name on it and someone wrote in 'bad guy.'"  (Pl.'s Br. at 19).  Plaintiff asserts that Cashman made that note and that it shows that he is biased against Plaintiff and acted in bad faith.

Plaintiff did not include that alleged document in any of the exhibits filed in connection with the motions.  Rather, Plaintiff directs the Court to the following deposition testimony from Cashman.  The cited page of Cashman's deposition begins with a portion of an answer to a question that is not included in the pages provided to the Court:

> of the time it's not Oakland County.  It's somebody else – we have to – our LEIN operator has to make phone contact with that agency.  You guys put this in LEIN, here's a warrant, is that warrant still good, is it confirmed? And if they say, no,

22

obviously we don't arrest them.  If they say yes, which most of the time it is, we arrest them and also if they'll pick up.

This is an Oakland County FOC warrant, so it's all part of the Oakland County system.  So these warrants – well, you'd have to ask the LEIN operator.  Normally they're automatically confirmed, but I would not be told if it was no good – I would have been told that.  I was told it was a valid warrant.

Q.      I understand that. I'm wondering who printed this page out.

A.      I probably did.  When – I told you when I run somebody in LEIN, all this stuff comes up.

Q.      That's what I was wondering.  This document – this document, this page - -

A.      If I ran you, you know, things would come up – that's just – but this – I ran it and – or they printed it out for me, but --

Q.      You ran it and this is page 56 of Exhibit B?

A.      Right?

Q.      Who wrote bad guy on it?

A.      Not me.  That's not my writing.

Q.      It's not?

A.      Nope.

Q.      Do you know who --

A.      That's not my writing on the phone numbers or anything.

Q.      Who would have written that on it if you had access to it?

A.      I don't know who wrote it.

Q.      Did anyone outside of the sheriff's department have access to your --

A.      No. Nobody outside of --

Q.      Did anyone outside of the sheriff's department have access to this document?

A.      Absolutely not.  Except the prosecutor's office when it's turned over to them.

Q.      Would they have given it back after it was turned over to them --

A.      No.

Q.      – or would've they gotten a copy?

A.      Prosecutor keeps – they get their own copy.

Q.      So this – whoever wrote bad buy is someone from the sheriff's department, correct?

A.      Correct.

Q.      You don't know who?

(Cashman Dep. at 79-80).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

## ANALYSIS

### I.    Defendant Cashman's Motion For Summary Judgment

Defendant Cashman's Motion asserts that he is entitled to qualified immunity as to the § 1983 claims asserted against him. He also challenges the remaining state-law claims asserted against him.

####    A.    Qualified Immunity

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the

24

United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, Defendant Cashman raises the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

"Qualified immunity is an affirmative defense, and a defendant bears the burden of pleading it in the first instance." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). "Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate" both that the challenged conduct violated a constitutional right and that the right was clearly established. *Id*. "If the plaintiff fails to establish either element, the defendant is immune from suit." *Id.*

Under the "clearly established" inquiry, the question is whether the right was so clearly

25

established that a reasonable official would understand that what he or she is doing violates the law. *Jones v. Byrnes*, 585 F.3d at 975. "The essential inquiry is whether the defendant had fair warning that his [or her] actions were unconstitutional." *Hensley v. Gassman*, 693 F.3d 681, 693–94 (6th Cir.2012). This inquiry must be undertaken in the consideration of the specific context of the case, not as a broad proposition. *Jones,* 585 F.3d at 975. In order to make such a showing, Plaintiffs need to direct the Court to a Supreme Court or Sixth Circuit case wherein a similar legal and factual scenario as that presented here was found to have resulted in a constitutional violation. *Bray, supra*.

Plaintiff's Complaint asserts the following § 1983 claims against Cashman: 1) a false arrest claim under federal law (Count I); 4) a false imprisonment claim under federal law (Count II); and 5) a malicious prosecution claim under federal law (Count III).

With respect to these § 1983 claims asserted against Cashman, the Court will consider whether:  1) viewing the facts in the light most favorable to Plaintiff, Plaintiff can establish that a constitutional violation occurred; and 2) if so, whether the right was clearly established at the time of the violation.

### 1.     Plaintiff's § 1983 Malicious Prosecution and False Arrest/Imprisonment Claims Based Upon Plaintiff's Arrest and Prosecution for Criminal Sexual Conduct

In Counts I, II, and III, Plaintiff asserts malicious prosecution and false arrest/imprisonment claims against Cashman.  Cashman contends that Plaintiff's malicious prosecution and false arrest claims against him fail because, among other things, Plaintiff cannot establish a lack of probable cause.

Both parties agree that the elements of a Fourth Amendment malicious prosecution claim

are as set forth in *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). "To succeed on a malicious-prosecution claims under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove" all of the following: 1) that the defendant made, influenced, or participated in the decision to prosecute the plaintiff; 2) there was a lack of probable cause for the criminal prosecution; 3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty, apart from the initial seizure; and 4) the criminal proceeding must have been resolved in the plaintiff's favor. *Id.*

Similarly, a false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Sykes*, 625 F.3d at 305 (citing *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005)).

"An arrest pursuant to a facially valid warrant," which is what we have here, "is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." *Voyticky*, 412 F.3d at 677. In order to overcome that bar, Plaintiff must prove that in order to procure the warrant, the defendant "knowingly and deliberately, or with a reckless disregard for the truth," made "false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Sykes*, 625 F.3d at 305; *see also Legenzoff v. Steckel*, 564 F. App'x 136, 149-50 (6th Cir. 2014).

If a plaintiff presents evidence that a defendant provided false information in order to obtain an arrest warrant, the Court then assesses whether the plaintiff could show that the issuing magistrate would not have issued the warrant without the false information. *Sykes*, 625 F.3d at 305; *Richardson v. Nassar*, 421 F. App'x 611, 616 (6th Cir. 2011). In other words, if the

27

defendant had made false statements or material omissions, the court "set[s] aside the [false] statements and includes the information omitted to determine" if the evidence presented was still sufficient to establish probable cause.  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

Plaintiff asserts that Cashman can be held liable in this case because "he fabricated probable cause against Plaintiff."  (Pl.'s Resp. Br. at 8).

But in asserting that Cashman "fabricated probable cause," Plaintiff does not identify any false or untruthful statements in Cashman's report that was provided to the prosecutor's office, and ultimately the magistrate who issued the warrant for Plaintiff's arrest.

Rather, Plaintiff argues that Cashman "fabricated evidence" against Plaintiff by virtue of not following the protocols in that: 1) on March 22, 2005 Cashman instructed RT's mother to ask RT if Plaintiff had touched her vagina, when the proper course would have been to have an investigative officer ask RT that question; and 2) on March 29, 2005 Cashman questioned RT in a suggestive manner as to which finger Plaintiff had touched her with (ie., asking her which finger while holding up his own right index finger).  (*See* Pl.'s Br. at 4-5).  Thus, the alleged "fabricated evidence" consists of: 1) RT having told Tatarly on March 22, 2005, in response to the question Cashman directed Tatarly to ask her, that Plaintiff had touched her vagina on two occasions; 2) RT having told Cashman on March 29, 2005, in response to his allegedly suggestive manner of questioning, that Plaintiff had touched her vagina with his right index finger.

Notably, Plaintiff himself was the one who raised the issue of Plaintiff having touched RT's vagina in the first place.  And he admitted having done so three times, and with his right index finger.  Thus, Plaintiff alleges that RT's statements are "fabricated" – even though they are

28

entirely consistent with Plaintiff's own admissions to Cashman and Spates and Plaintiff's own trial testimony.

Moreover, even if the Court were to accept Plaintiff's argument that the above evidence is "fabricated" and thus false, the Court must then set aside that evidence (i.e., RT's statement to Tatarly that Plaintiff touched her vagina and RT's statement to Cashman that Plaintiff used his right index finger when doing so) and consider whether the remaining evidence was sufficient to establish probable cause. *Sykes, supra; Richardson, supra.*

Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. *Sykes*, 625 F.3d at 306. Under Michigan law, a person is guilty of criminal sexual conduct ("CSC") in the second degree if the person engages in sexual contact with another person who is under 13 years of age. Mich. Comp. Laws § 750.520c(1)(a).

Probable cause existed to charge Plaintiff with five counts of CSC based solely upon: 1) RT's March 15, 2005 interview at Carehouse wherein RT stated that Plaintiff had forced her to touch Plaintiff's genitalia on two different occasions; and 2) Plaintiff's statement during his March 21, 2005 interview with Cashman and Spates, during which Plaintiff admitted that he had touched RT's vagina on three occasions and his only explanation for having done so was that he learned to do that from his mother and that if a girl reacts violently in response, then she is sick. Thus, even without the allegedly fabricated statements from RT, probable cause existed to charge Plaintiff with five counts of CSC.

Accordingly, Plaintiff cannot get past the first prong of the qualified immunity analysis because, even when viewing the facts in a light most favorable to Plaintiff, Plaintiff has not

shown that a constitutional violation occurred.[1]  Defendant Cashman is entitled to qualified immunity with respect to Plaintiff's federal malicious prosecution and false arrest/imprisonment claims that are based on his arrest and prosecution for CSC.

In addition, because Michigan law also requires a plaintiff to show a lack of probable cause to prevail on a false arrest/imprisonment or malicious prosecution claim,[2] Cashman is also entitled to summary judgment as to Counts X and XI of Plaintiff's Complaint.

### 2.  Plaintiff's § 1983 False Arrest/Imprisonment Claim Based Upon Arrest on Outstanding Bench Warrant

Count I of Plaintiff's Complaint asserts a § 1983 claim of false arrest.  In responding to Defendant Cashman's Motion for Summary Judgment, Plaintiff asserts that he has two different false arrest claims.  (*See* Pl.'s Br. at 11) ("The Defendant [sic] was falsely imprisoned and arrested as a result of Defendant Cashman's conduct twice.").  The first false arrest claim is the one discussed above, which is based on Plaintiff's arrest for CSC.

Plaintiff asserts that he has a separate false arrest claim based on Cashman having arrested Plaintiff on an outstanding bench warrant in March of 2005.  (*See* Pl.'s Br. at 12) ("The first offense of Defendant Cashman falsely imprisoning Plaintiff came when Defendant Cashman

---

[1]In addition, even if he could establish that a constitutional violation occurred under these facts, Plaintiff would also have to show that the right was "clearly established" at the time of the violation.  In support of both his malicious prosecution and false arrest claims, Plaintiff asserts the *Gregory* case is "closely analogous" to this case.  (Pl.'s Br. at 9) (citing *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)).   The Court disagrees.

[2]*See, e.g., Burleigh v. City of Detroit*, 80 F. App'x 454, 461 (6th Cir. 2003) ("To prevail on his false arrest, false imprisonment, and malicious prosecution claims under state law, [a plaintiff] must prove an absence of probable cause. *See Tope v. Howe*, 179 Mich.App. 91, 445 N.W.2d 452, 459 (1989)."

arrested Plaintiff for a bench warrant that was meant to be issued against his ex-wife.").

Cashman arrested Plaintiff, on a bench warrant, on the same date that he and Spates interviewed Plaintiff at his home.  (*See* Pl.'s Br. at 12; Cashman's Police Report, Pl.'s Ex. F at OC 10, stating "I advised him that there was a bench warrant for his arrest from FOC and that I would have to take him into custody (Dispatch had previously confirmed) which he complied with.").

The bench warrant at issue was submitted as Exhibit A to Cashman's Reply Brief.  It was issued by a judge with the Oakland Judge Circuit Court, Friend of the Court Unit.  It identifies Plaintiff by name (Jacob Trakhtenberg) and includes his address, date of birth, and social security number.  It orders the arrest of Plaintiff and states:

> Bring him/her before the Court immediately, or he/she may be released when a cash bond is posted in the amount of $1500.00 for personal appearance before the Court at its next session.

> Current total arrearages on record at the Friend of the Court and the estimated costs associated with failure to appear are: $1,831.84.

(*Id*.).

Without directing the Court to *any record evidence* to support the assertion, Plaintiff asserts in his motion that the bench warrant was issued in error and should have been issued against his ex-wife, not against Plaintiff.  (*See* Pl.'s Br. at 12, asserting that the bench warrant "was meant to be issued against his ex-wife.").

Plaintiff then asserts that he "repeatedly pleaded with Defendant Cashman to simply look up his case or call the Court clerk as court was still in session.") (Pl.'s Br. at 12).  The evidence in support that assertion that Plaintiff directs the Court to is Defendant Cashman's police report, Plaintiff's Exhibit F. In that report, Cashman stated that Plaintiff "went on repeatedly

31

complaining about the warrant and that it was probably on his ex-wife. I replied maybe so but that he was still going to have to see Judge Alexander tomorrow to straighten it out.  Jacob was then transported and lodged at OCJ on the FOC warrant (05-26322)."  (Ex. F. at OC11).

In seeking summary judgment, Cashman notes that "Plaintiff offers no evidence that the [bench] warrant was not validly issued in his name."  (Def.'s Reply Br. at 5).  Cashman also directs the Court to his deposition testimony wherein he testified, consistent with his report, that his normal procedure would have been to call dispatch to confirm or double check a warrant that appeared on the LEIN system.  (Cashman Dep. at 59-60; *see also* Ex. F to Pl.'s Br. at OC10, noting "Dispatch had previously confirmed" the warrant for his arrest with FOC).

Cashman also asserts that, in any event, the Third Circuit case that Plaintiff relies on can be easily distinguished.

The Court agrees and concludes that Cashman is entitled to qualified immunity with respect to Cashman arresting Plaintiff on the bench warrant in March of 2005.

"An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983."  *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005); *see also Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) ("[A]n arrest based on a facially valid warrant approved by a magistrate provides a complete defense.").

Here, Cashman arrested Plaintiff based on a bench warrant issued for Plaintiff's arrest. "Arrest warrants in the hands of a police officer, unless facially invalid, are presumed valid." *Fettes v. Hendershot*, 375 F. App'x 528, 532 (6th Cir.2010).  Here, the bench warrant, issued in Plaintiff's name, and listing his address, date of birth, and social security number, was facially

valid.  Indeed, Plaintiff does not challenge the *facial validity* of the warrant.  Rather, Plaintiff asserts that the bench warrant should not have been issued against him.

Plaintiff asserts that he can maintain a false arrest claim against Cashman, despite the existence of the facially valid bench warrant against him, based upon *Berg v. County of Allegheny*, 219 F. 3d 261 (3rd Cir. 2000).

*Berg* involved a case of mistaken identity, based upon a clerical error in entering the criminal case number, that resulted in an arrest warrant being issued that authorized the arrest of a person named Raymond Berg, instead of a man named Paul Banks.  The arrest warrant was for violating parole.  But Berg had fully served his sentence and had completed his parole at the time the warrant was issued.  After his arrest, Berg sued several persons, including the person who made the data-entry error and the officer who arrested him pursuant to the warrant.

The district court concluded that the officer who arrested Berg pursuant to the arrest warrant was entitled to qualified immunity.  In so ruling, the district court concluded that the arrest was not unconstitutional because the facially valid warrant gave the arresting officer probable cause for the arrest.  *Id.* at 268.  Notably, the district court did not engage in the second prong of the qualified immunity analysis.

In evaluating *Berg*'s claims on appeal, the Third Circuit first addressed the first prong of the qualified immunity analysis – whether the plaintiff could establish a constitutional violation in the first place.  The Third Circuit concluded in *Berg*, and reaffirmed in *Noone*, that an "arrest violates the Fourth Amendment if executed pursuant to an erroneously issued warrant." *Noone v. City of Ocean City*, 60 F. App'x 904, 907 (3d Cir. 2003); *Berg*, 219 F.3d at 270.  Thus, the Third Circuit concluded that because "the government officials who issued the warrant" "did not

33

have probable cause to arrest Berg, the arrest violated the Fourth Amendment." *Berg*, 219 F.3d

at 271.  That did not, however, end the inquiry.

The Third Circuit then considered whether the officer who arrested Berg could be held

liable for Berg's unconstitutional arrest.  As to the arresting officer, the court explained that:

> Ordinarily, it is reasonable for an officer to assume that a warrant has been
> issued for probable cause. As the Supreme Court explained in *Baker*,

>> Given the requirements that arrest be made only on probable cause
>> and that one detained be accorded a speedy trial, we do not think a
>> sheriff executing an arrest warrant is required by the Constitution
>> to investigate independently every claim of innocence, whether the
>> claim is based on mistaken identity or a defense such as lack of
>> requisite intent.

> 443 U.S. at 145–46, 99 S.Ct. 2689. Therefore, we have generally extended
> immunity to an officer who makes an arrest based on an objectively reasonable
> belief that there is a valid warrant.

*Berg*, 219 F.3d at 273.  The Court went on to explain that, "[n]evertheless, an apparently valid

warrant does not render an officer immune from suit if his reliance on it is unreasonable in light

of the relevant circumstances."  *Id*.  The Court concluded that the rather unusual circumstances

there raised "valid questions concerning the reasonableness" of the arresting officers's] conduct:

> We think Springer's report raises valid questions concerning the reasonableness
> of Wolfgang's conduct in this case. Because the District Court concluded that
> Berg's arrest had not been unconstitutional, it did not reach Wolfgang's qualified
> immunity claim. Consequently, it did not make the findings of fact necessary to
> determine, as a matter of law, whether Wolfgang's reliance on the warrant was
> unreasonable under the circumstances with which he was confronted. Therefore,
> we will remand the cause so that the District Court can make the necessary
> findings, and can consider the qualified immunity issue in the first instance.

*Id.* at 273-74.

The unusual circumstances, set forth in a report submitted by a Pennsylvania Constable

hired by plaintiff who opined it was not reasonable for the arresting officer to have arrested Berg

34

on the warrant he had before him included: an invalid address for Berg on the warrant, "Berg's documentation that he had completed his probation" when the arrest warrant was for violating parole, and "the fact that Berg had a driver's license despite allegedly being on parole for DUI." *Id.* Yet even with those facts, the Third Circuit did not make a qualified immunity ruling. Rather, it remanded the case to the district court so that the district court could make a qualified immunity ruling.

Plaintiff's reliance on *Berg* is misplaced for multiple reasons. First, it is a Third Circuit case and it is therefore not binding.

Second, the case can easily be distinguished. *Berg* involved an arrest warrant that was erroneously issued against *Berg*. Here, Plaintiff *asserts* that the bench warrant should have been issued against his ex-wife and not him but *Plaintiff has offered no evidence to establish that there was any error with respect to the bench warrant that was issued for his arrest*. Thus, unlike *Berg*, there is no evidence to indicate the bench warrant issued against Plaintiff was not actually valid. That alone defeats his reliance on *Berg*.

Third, even if that bench warrant had been issued in error, the Court concludes that Cashman would still be entitled to qualified immunity under the facts we have here. In *Berg*, the Third Circuit ruled that an "apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances." Here, there are no circumstances that would make Cashman's reliance on the bench warrant, that he confirmed with dispatch, unreasonable. Cashman arrested Plaintiff pursuant to a bench warrant that identified Plaintiff by name, and included his address, date of birth, and social security number. Notably, Plaintiff does not assert that any of that information was incorrect in any way. This case simply

35

does not have facts analogous to *Berg*.

The Court concludes that Plaintiff has not met his burden of establishing that Cashman's conduct in arresting him upon the bench warrant violated a constitutional right or that the right was clearly established. Accordingly, Defendant Cashman is entitled to qualified immunity as to these additional false arrest claims (i.e. any false arrest or imprisonment claims asserted in Counts I, II and X of Plaintiff's complaint that are based upon his having been arrested by Cashman on an outstanding bench warrant).

### 3.    The "Real Claim" That Plaintiff Appears To Be Asserting

There is no question that Cashman failed to follow Oakland County's Protocols in some respects. But unless he can show that those failures to follow the protocol resulted in a violation of Plaintiff's federal constitutional rights, Cashman cannot be held liable under § 1983. Although he pleaded no such claim, Plaintiff's Counsel, in substance, appears to argue that Cashman violated Plaintiff's constitutional rights by virtue of having failed to strictly follow the requirements in the protocol.

Even if Plaintiff had included such a claim in his complaint, Cashman would be entitled to qualified immunity as to such a claim. Plaintiff has not provided any legal support for the theory that failure to conduct an investigation in strict compliance with Oakland County's Protocol or the Governor's Task Force Protocol, amounts to a constitutional violation. And at least one other judge in this district has noted the lack of support for such a theory. *See Palmer v. Adams,* 2012 WL 2071810  at * 11 (E.D. 2012).  And without a Supreme Court or Sixth Circuit case that would apprise Cashman that his failure to follow the protocols constitutes a constitutional violation, there is no "clearly established law" in connection with the second

36

prong of the qualified immunity analysis.  Accordingly, even if Plaintiff had included such a claim in his Complaint, Cashman would be entitled to qualified immunity with respect to the claim.

**B.      Remaining § 1983 Counts Asserted Against Cashman**

In addition to the substantive § 1983 counts asserted against Cashman, Plaintiff's Complaint also includes two counts that ask for punitive damages against the "individual defendants," Counts VI and VII.

Punitive damages are available, under some circumstances, in a case brought under § 1983.  "Punitive damages are appropriate in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

But punitive damages are a remedy, not a separate cause of action.  *Shoup v. Doyle*, 974 F.Supp.2d 1058, 1086-87 (S.D. Ohio 2013).  And in any event, because all substantive § 1983 claims against Cashman are being dismissed based on qualified immunity, the Court must also dismiss these counts.

**C.      Official Capacity Claims Against Cashman**

A suit against an individual in his or her official capacity is the equivalent of a suit against the governmental entity itself.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  Thus, Plaintiff's official capacity claims asserted Cashman are claims against Oakland County.  Those claims will be addressed in the section of this Opinion & Order that analyzes the remaining Defendants' Motion for Summary Judgment.

**D.      Challenges to Remaining State-Law Claims**

In his motion, Cashman asserts that he is entitled to governmental immunity with regard to Plaintiff's state-law tort claims.  (*See* Def.'s Br. at 13). In this section of the brief Cashman also challenges Plaintiff's ability to establish the essential elements of the state-law torts or claims.

Both parties fail to distinguish between the differing governmental immunity tests that apply to negligence versus intentional torts like Plaintiff's IIED and abuse of process claims. As explained by the Sixth Circuit in *Kindl v. City of Berkley*, __ F.3d __, 2015 WL 4899417 (6th Cir. 2015):

> Michigan law on governmental immunity for public officials contains different tests for negligence claims and intentional torts. Mich. Comp. Laws § 691.1407(2) & (3); *see also Odom v. Wayne Cnty.*, 482 Mich. 459, 760 N.W.2d 217 (2008) (discussing both tests in depth).

*Id.* at * 10.

**1.      Gross Negligence Claim**

Plaintiff's Complaint includes a Count titled, "Gross Negligence."  (Count XIII of Plaintiff's Complaint.)

As explained in *Kindl*, the "standard applicable to negligence claims is spelled out at § 691.1407(2) and includes the following three requirements:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of

38

the injury or damage.

§ 691.1407(2) (emphasis added). For purposes of the immunity statute, gross
negligence occurs when a defendant's conduct is "so reckless as to demonstrate a
substantial lack of concern for whether an injury results." § 691.1407(8)(a).
Where material disputes of fact exist as to whether the conduct was grossly
negligent, award of governmental immunity at summary judgment is improper.
*Oliver v. Smith*, 290 Mich.App. 678, 810 N.W.2d 57, 62 (2010).

*Id*. at * 10.

In challenging Plaintiff's "Gross Negligence" Count, Defendant makes three separate

arguments, none of which are specifically addressed by Plaintiff in his response brief.  Rather,

Plaintiff's response brief simply asserts that Cashman acted in bad faith and then argues that

Cashman's conduct arose to the requisite levels to satisfy the elements of the various claims.

(Pl.'s Br. at 20).

Among other things, Cashman asserts that Plaintiff cannot establish that his alleged

conduct (failing to follow the protocol) was a proximate cause of his injuries (being charged,

arrested, prosecuted, and convicted of CSC).  (Pl.'s Br. at 22)

Under Michigan's governmental immunity statute, the governmental employee's conduct

must be "the" proximate cause of the injury or damage.  *See Robinson v. City of Detroit*, 462

Mich. 439 (2000).  Thus, for purposes of Michigan's governmental immunity statute, proximate

cause means "the one most immediate, efficient, and direct cause preceding an injury."  *Id*.

Cashman argues, persuasively, that Plaintiff cannot establish that he was the proximate cause of

his injury.  (*See* Def.'s Br. at 23-24).

Plaintiff's alleged injury from Cashman's conduct is that he was charged, arrested, and

convicted of CSC.  (*See* Pl.'s Compl. at ¶ 89, alleging that as a "proximate result of the gross

negligence" of Cashman, Plaintiff was charged, arrested, and convicted of criminal offenses.)

39

This Court concludes that no jury could find that Cashman's alleged conduct (failing to follow the protocols) is the proximate cause of Plaintiff having been arrested, charged with CSC, and convicted of CSC.

Again, Plaintiff alleges that 1) on March 22, 2005 Cashman instructed RT's mother to ask RT if Plaintiff had touched her vagina, when the proper course would have been to have an investigative officer ask RT question; and 2) on March 29, 2005 Cashman questioned RT in a suggestive manner as to which finger Plaintiff had touched her with (ie., asking her which finger while holding up his own right index finger). But, as explained above, probable cause to arrest Plaintiff for CSC existed prior to, and independent from, those events. Moreover, Plaintiff testified at trial, admitting that he touched RT's vagina on three occasions. Plaintiff was convicted because the Court did not find him credible with respect to *why* her touched RT's vagina. Thus, the proximate cause of Plaintiff having been arrested and charged with CSC was RT's interview at Carehouse and Plaintiff's own admissions to Cashman. And the state-court judge's credibility determinations were the proximate cause of Plaintiff having been convicted on CSC charges. The Court therefore concludes that Cashman is entitled to governmental immunity with respect to Count XIII.

### 2.    Intentional Torts Under Michigan Law

Defendant Cashman's brief challenges the tort claims asserted against him on several grounds.

### a.    IIED Claim

Count XII of Plaintiff's Complaint assert a claim for intentional infliction of emotional distress under state law.

40

Among other things, Cashman contends that Plaintiff cannot establish an IIED claim under Michigan law based upon Cashman's conduct.

Under Michigan law, the essential elements of a claim of intentional infliction of emotional distress are: 1) extreme and outrageous conduct, 2) intent or recklessness, 3) causation, and 4) severe emotional distress. *Graham v. Ford*, 237 Mich.App. 670, 674 (2000); *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir.2005). In ruling on such a claim, it is initially for the trial court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous to permit recovery. *Webster*, 394 F.3d at 442. If reasonable minds may differ, however, "it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct is sufficiently extreme and outrageous to result in liability." *Id.*

"The threshold for showing extreme and outrageous conduct is high.  No cause of action will necessarily lie even where a defendant acts with tortious or even criminal intent." *VanVorous v. Burmeister*, 262 Mich. App. 467, 481 (2004).  "Rather, liability is imposed only where 'the conduct had been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 603 (1985)); *Graham*, 237 Mich.App. at 674.

Defendant Cashman asserts that his conduct cannot be considered sufficiently extreme to result in liability as to this claim.  (Def.'s Br. at 19).  The Court agrees.

Plaintiff faults Cashman for failing to follow the protocols in that: 1) on March 22, 2005 Cashman instructed RT's mother to ask RT if Plaintiff had touched her vagina, when the proper

41

course would have been to have an investigative officer ask RT question; and 2) on March 29, 2005 Cashman questioned RT in a suggestive manner as to which finger Plaintiff had touched her with (ie., asking her which finger while holding up his own right index finger).  (*See* Pl.'s Br. at 4-5).

As explained above, based upon RT's statements during the Carehouse interview, and Plaintiff's own admissions made during his interview with Cashman and Spates, probable cause existed for Plaintiff to be charged with five counts of CSC.   That is, probable cause existed prior to, and independent of, those challenged statements by RT.

Moreover, the statements that were elicited from RT from Cashman's actions in failing to follow the protocol (RT saying that her father had touched her vagina on three occasions and did so using his right index finger) were consistent with Plaintiff's own admissions and trial testimony.

Under these facts, no reasonable juror could conclude that Cashman's conduct was sufficiently extreme or outrageous enough to impose liability.

### b.        Abuse Of Process Claim

In Count XIV, Plaintiff asserts an Abuse of Process claim under Michigan law.  (Compl. at 21-22).

In seeking summary judgment as to this claim, Cashman's brief sets forth the requirements for pleading and proving an abuse-of-process claim under Michigan law and challenges Plaintiff's ability to proceed on this count.

As to this Count, Plaintiff's response to Cashman's motion simply states that "Plaintiff alleged in the Complaint under Count XIV and has provided evidence within this case upon

which a reasonable jury could find for Plaintiff on the abuse of process claim."  (Pl.'s Br. at 21).

With respect to abuse-of-process claims under Michigan law, the Sixth Circuit has

explained that:

> In Michigan, to establish a claim for abuse of process, a plaintiff must prove: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585, 594 (1981) (citation omitted). For an abuse-of-process claim, the misconduct "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id*. at n. 18 (quoting Restatement (Second) of Torts § 682 cmt. a (1977)).

*Garcia v. Thorne*, 520 F. App'x 304, 311 (6th Cir. 2013).

"In other words, the plaintiff must show that the defendant used a proper legal procedure

for a purpose collateral to its intended use, and there must be some corroborating act that

demonstrates the ulterior purpose."  *Alman v. Reed*, 703 F.3d 887, 905 (6th Cir. 2013) (citing

*Bonner v. Chicago Title Ins. Co.*, 194 Mich.App. 462, 487 N.W.2d 807, 812 (1992)).  In *Alman*,

the Sixth noted that Michigan courts have explained that:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Alman*, 703 F.3d at 905 (quoting *Three Lakes Ass'n v. Whiting*, 75 Mich. App. 564, 573 (1977)).

"In *Three Lakes*, for example, a corporation sought tort damages from a nonprofit for

obstructing the corporation's condo project. *Id*. at 687–88. The corporation offered to drop the

suit if the nonprofit ended all of its opposition to the project, both legal and illegal. *Id*. at 690.

When the nonprofit later sued the corporation for abuse of process, the court found the

settlement demand collateral to the purpose of the tort suit—and thus to be an improper use of process—because the corporation asked the nonprofit to end even legal opposition to the project. *Id*. at 690–91." *Patrich v. Farber*, 448 F. A'ppx 526, 530 (6th Cir. 2011).

Here, as was the case in *Garcia*, Plaintiff's abuse-of-process claim against Cashman fails because Cashman's alleged conduct "has to do with the initiation of criminal proceedings, not the misuse of process." *Garcia*, 520 F. App'x at 311 (citing *Spear v. Pendrill*, 164 Mich. 620 (1911) for well-established proposition that an abuse-of-process cause of action "lies for the improper use of process after it has been issued, not for maliciously causing it to issue."). Plaintiff has not alleged, nor presented evidence to establish, that Cashman made improper use of legal process during the course of his criminal prosecution. Cashman is entitled to summary judgment on this claim.

### E.      Michigan Constitution Claim

Count IX of Plaintiff's Complaint is titled "Violation of Article 1 § 17 of the Michigan Constitution" and alleges that Defendants "through acts, omissions, customs and policies, with respect to the investigation and prosecution of Plaintiff, violated Plaintiff's rights conferred by Article 1 Section 17 of the Michigan Constitution which includes, but are not limited to, his right to fair and just treatment in an investigation and prosecution." (Compl. at 16).

In his motion, Defendant Cashman asserts that the Court should dismiss this count based upon the Michigan Supreme Court's decision in *Jones v. Powell,* 462 Mich. 329 (2000).

Plaintiff's response brief does not respond to this challenge and, at the hearing, Counsel

44

confirmed that Plaintiff wishes to abandon this claim. (*See* 10/15/15 Hrg. Tr.).[3] The Court will therefore dismiss Count IX.

### F.  Count XV of Plaintiff's Complaint Should Be Dismissed

Count XV of Plaintiff's Complaint is titled, "Claims for Damages and Jury Demand." This Count does not assert any substantive claims. Rather, it simply references Plaintiff's claims set forth in other counts and states that he seeks damages and demands a jury. This Count must be dismissed if Defendants are entitled to summary judgment as to the substantive claims in Plaintiff's Complaint.

## II.  The Remaining Defendants' Motion For Summary Judgment

The remaining Defendants named in this action, Oakland County, the Oakland County Sheriff's Department, and Sheriff Michael Bouchard, filed their own Motion for Summary Judgment. (Docket Entry No. 36).

### A.  Claims Against Sheriff's Department

---

[3]Moreover, the Court would dismiss Count IX in any event because there is no inferred damage remedy available against a municipality like Oakland County, or its individual government employees like Cashman, for alleged violations of the Michigan Constitution. *See Jones*, 462 Mich. at 335 ("[O]ur decision in *Smith* provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee."). The *Jones* court explained that a narrow remedy against the State was recognized in *Smith* because of the unavailability of any other remedy. *Id.* The court explained that those concerns, however, do not apply in actions against a municipality or its employees because, unlike states and state officials sued in an official capacity, municipalities are not protected by the Eleventh Amendment. *Id.* Accordingly, under *Jones*, Plaintiff cannot seek damages for an alleged violation of the Michigan Constitution because other potential avenues of relief – § 1983 claims and state-law tort claims – exist. *Jones, supra*; *Smith v. Michigan*, 256 F.Supp.2d 704, 706 (E.D. Mich. 2003); *HRSS, Inc. v. Wayne Cnty. Treasurer*, 279 F.Supp.2d 846, 851 (E.D. Mich. 2003); *Evans v. Wayne Cnty.*, 2011 WL 5546230 at * 12 (E.D. Mich. 2011); *Hescott v. City of Saginaw*, 2012 WL 5379453 at *1 (E.D. Mich. 2012).

Defendants' motion notes that in addition to Oakland County, Plaintiff has sued the Oakland County Sheriff's Department as a Defendant in this action. Defendants' motion asserts that all claims against the Sheriff's Department must be dismissed because a county sheriff's department is not a legal entity capable of being sued.

Plaintiff's brief does not respond to this argument. Thus, Plaintiff has ignored this challenge and has not provided any authority to establish that he can maintain a claim against the Oakland County Sheriff's Department.

The Court shall dismiss all claims against the Oakland County Sheriff's Department because judges in this district, and in the Western District, have consistently held that Sheriff's Departments or offices are not entities subject to suit. *Pappas v. Oakland County*, 2009 WL 3698552 (E.D. Mich. 2009) (citing several decisions); *see also Sumner v. Wayne County*, 94 F. Supp.2d 822, 827 (E.D. Mich. 2000); *Howard v. Wayne County Sheriff's Office*, 417 F. App'x 465, 467-68 (6th Cir. 2011).

### B.     Official Capacity Claims and Municipal Liability

In addition to asserting claims against Cashman in his individual capacity, Plaintiff has also asserted official capacity claims against both Cashman and Sheriff Bouchard.[4]

A suit against an individual in his or her official capacity is the equivalent of a suit against the governmental entity itself. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

---

[4]To the extent that Plaintiff's Complaint asserts §1983 claims against Sheriff Bouchard in his individual capacity, Sheriff Bouchard is entitled to summary judgment, given that Plaintiff has since agreed that Bouchard did not have any involvement nor personal knowledge regarding the criminal investigation at issue or Plaintiff's criminal prosecution. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 84).

46

Thus, Plaintiff's official capacity claims asserted Cashman and Sheriff Bouchard are claims against Oakland County and they stand in the shoes of Oakland County. *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003).

As set forth above, this Court is dismissing all § 1983 claims asserted against Defendant Cashman in his individual capacity, based upon qualified immunity.

"Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may be liable to a plaintiff under § 1983 if the plaintiff demonstrates that a constitutional violation occurred *and* that it was the result of a "policy or custom" of the municipality." *Cleary v. County of Macomb*, 409 F. App'x 890, 906 (6th Cir. 2011) (emphasis added). Thus, "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *Voyticky,* 412 F.3d at 679 (For municipal liability to exist, "a constitutional violation must take place.").

"Where, as here, there is no constitutional violation, there can be no municipal liability." *Cleary,* 409 F. A'ppx at 906. Oakland County is therefore entitled to summary judgment as to all of Plaintiff's § 1983 claims.

## C. Absolute Immunity As To State-Law Claims

Given the nature of Plaintiff's Complaint (ie., asserting claims against "all Defendants" rather than specifying the Defendants charged in each count), Defendants are unsure of whether Plaintiff is asserting any state-law tort claims against Bouchard or Oakland County. Defendants' motion asserts that, "[t]o the extent Plaintiff is asserting any state tort law claims against Oakland County and/or Defendant Bouchard they are entitled to immunity." (Defs.' Br. at 24).

47

### 1. Oakland County

Michigan's Governmental Tort Liability Act provides that "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1); *see also Jones v. Muskegon County*, 625 F.3d 935, 947 (6th Cir. 2010) (explaining that Michigan's Governmental Tort Liability Act provides that a governmental agency, such as a county, is immune from liability where it is 'engaged in the exercise or discharge of a governmental function.'").

Defendants contend that there can be no dispute that criminal investigation and prosecution are governmental functions and that, accordingly, any tort claims Plaintiff asserts against Oakland County must be dismissed.

The Statement of Issues Presented in Plaintiff's brief contests that Oakland County is entitled to absolute immunity under the Act. (*See* Pl.'s Br. at vii, stating that Plaintiff Answers "No" to the issue of whether Oakland County and Sheriff Bouchard are entitled to absolute immunity). His brief, however, does not discuss Michigan's Governmental Tort Liability Act.

At the hearing, Counsel for Plaintiff confirmed that Plaintiff's brief failed to respond to this challenge. Accordingly, like the situation seen in *Jones*, "Plaintiff has not pointed to any conduct by the County in which it acted beyond its governmental function and has not argued that any exception to the County's immunity applies." *Id*. at 947. Any state-law tort claims asserted against Oakland County shall be dismissed because the County has absolute immunity as to those claims.

### 2. Sheriff Bouchard

Defendants contend that Sheriff Bouchard is immune from Plaintiff's state-law tort claims under Mich. Comp. Laws § 691.1407(5).

Michigan's Governmental Tort Liability Act provides that a "judge, a legislator, and the elective or highest appointive executive official of all levels of government" is "immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mich. Comp. Laws § 691.1407(5). " The position of sheriff is an elected one in Michigan" and therefore this section applies to Sheriff Bouchard. *Beck v. Haik*, 234 F.3d 1267 at * 8 (6th Cir. 2000); *see also Kelley v. Ferguson*, 2015 WL 1510635 at * 11 (E.D. Mich. 2015) ("Sheriff Bouchard is an elected official" and thus this section applies to him).

Notably, it is now undisputed that Bouchard did not have any involvement nor personal knowledge regarding the criminal investigation or Plaintiff's criminal prosecution. (Defs.' Stmt. & Pl.'s Ctr. Stmt. at ¶ 84). Nevertheless, in the Statement of Issues Presented in Plaintiff's brief he contests that Bouchard is entitled to absolute immunity under the Act. (*See* Pl.'s Br. at vii, stating that Plaintiff Answers "No" to the issue of whether Sheriff Bouchard is entitled to absolute immunity). His brief, however, does not discuss or analyze this ground for relief.

Accordingly, Plaintiff has not identified any actions taken by Sheriff Bouchard, much less any actions that were taken outside the scope of his authority. The Court shall dismiss all state-law tort claims asserted against Sheriff Bouchard.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant Cashman's Motion for Summary Judgment, and the Motion for Summary Judgment filed by the remaining Defendants,

49

are GRANTED and Plaintiff's claims against Defendants shall be dismissed with prejudice.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  October 26, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 26, 2015, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager