NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0608n.06

No. 15-2495

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 17, 2016
DEBORAH S. HUNT, Clerk

YAKOV TRAKHTENBERG,

      Plaintiff-Appellant,

v.

COUNTY OF OAKLAND, et al.,

      Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:    CLAY, KETHLEDGE, and DONALD, Circuit Judges.

CLAY, Circuit Judge.  Plaintiff Yakov Trakhtenberg ("Plaintiff") appeals the district court's order granting summary judgment for Defendants Oakland County, Oakland County Sheriff's Department, Sheriff Michael J. Bouchard, and Detective Terry Cashman (collectively, "Defendants") on Plaintiff's 42 U.S.C. § 1983 claims and associated state-law claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

BACKGROUND

Plaintiff was married to Liliya Tatarly from 1997 to 2000, during which period they had a daughter, RT. After their divorce, Ms. Tatarly had sole legal and physical custody of RT, but Plaintiff was entitled to visitation. Pursuant to the visitation agreement, RT stayed with Plaintiff every other weekend. In early March 2005, when RT was eight years old, she approached Ms. Tatarly and told her that during a visitation with her father, she had gone into Plaintiff's room at night because she was cold. Plaintiff had told RT to get in bed with him so that she could warm up. Then, once she was in bed with him, Plaintiff took her hand and placed it on his genitalia.

After hearing this story, on March 11, 2005, Ms. Tatarly called the Family Independence Agency ("FIA") to report the alleged sexual abuse.

On March 14, 2005, a trained investigator with CARE House, Amy Allen, conducted a forensic interview of RT. During this interview, RT reiterated her previous claims and told Ms. Allen that Plaintiff had forced her to touch his "private spot" twice in December 2004. (R. 36-4, PageID #1676–77.) She said that Plaintiff instructed her to move her hand "lower, lower," until she was forced to touch something that felt like "gushy balls." (*Id.*)

After this interview was completed, the case was referred to Detective Cashman, who had not been present at the initial CARE House interview.[1] Det. Cashman, along with FIA investigator Cleo Spates, visited Ms. Tatarly and RT on March 18, 2005. Ms. Spates talked to RT while Det. Cashman discussed the investigative process with Ms. Tatarly. RT reiterated roughly the same information to Ms. Spates that she had during her interview with Ms. Allen.

Three days later, on March 21, 2005, Det. Cashman and Ms. Spates interviewed Plaintiff at his residence. Plaintiff confirmed that RT had been coming into his bedroom at night because she was cold and had a stomach ache. Plaintiff also confirmed that RT came into his bed and that he rubbed her stomach. Plaintiff further informed Det. Cashman and Ms. Spates that, when he rubbed RT's stomach, he put his finger inside her underwear and pressed down on the top of her vagina three times because he learned from his mother and grandmother that it was possible to tell if a girl was sick by seeing if she reacted violently to this test. Lastly, Plaintiff confirmed

---

[1] This was not the first time that Det. Cashman had dealt with Plaintiff. While Plaintiff was married to Ms. Tatarly, he had contacted the police several times to complain that he was being abused by Ms. Tatarly. Det. Cashman was one of the responding officers to these calls. However, Det. Cashman did not believe Plaintiff's claims and told Plaintiff to stop calling the police.

Case 2:14-cv-13854-SFC-MJH ECF No. 58 PageID.2890 Filed 11/17/16 Page 3 of 15   (3 of 15)
Case: 15-2495   Document: 54   Filed: 11/17/2016   Page: 3

No. 15-2495

that he took RT's hand and used it to rub his own stomach. Plaintiff denied, however, that he ever moved RT's hand to his genitals.

During the interview, Plaintiff attempted to demonstrate how he touched RT's vagina on Ms. Spates; however, she stopped him and told him that she did not want to be touched. Based on Plaintiff's statements and actions, Ms. Spates concluded that the situation with RT was "alarming," given that Ms. Spates had never heard of touching a girl's vagina as a way to determine whether she had a stomach ache. (R. 36-5, PageID #1681, 1691.) She also concluded that Plaintiff did not understand boundaries. Based on her interviews with RT and Plaintiff, as well as the interview conducted at CARE House, Ms. Spates filed a complaint against Plaintiff and a petition to terminate his parental rights, as she believed that the "preponderance of the evidence" supported a finding of abuse. (R. 36-6, PageID #1693–94; R. 36-7, PageID #1696–97.)

The following day, on March 22, 2005, Det. Cashman spoke with Ms. Tatarly on the phone, during which Det. Cashman asked Ms. Tatarly to ask RT whether Plaintiff had ever touched her private parts with his finger. Two days later, Ms. Tatarly called Det. Cashman to report that RT responded that her father did, in fact, touch her at least twice. Ms. Tatarly also mentioned that RT said she did not share this before because she thought she could only say what Plaintiff forced her to do, not what Plaintiff had done to her.

On March 29, 2005, Det. Cashman and Ms. Spates visited RT and Ms. Tatarly at their home in order to discuss this new information—*i.e.*, the revelation that Plaintiff had touched RT's vagina. Ms. Spates conducted another forensic interview during which she confirmed the following: (1) Plaintiff touched RT's vagina on two separate occasions; (2) RT did not share this information previously because she thought she could only talk about what her father had made

Case 2:14-cv-13854-SFC-MJH ECF No. 58 PageID.2891 Filed 11/17/16 Page 4 of 15 (4 of 15)
Case: 15-2495   Document: 34   Filed: 11/17/2016   Page: 4

No. 15-2495

her do to him; (3) Plaintiff touched RT with one finger on the top of her vagina but did not insert
his finger; and (4) Plaintiff forced RT to touch his genitalia three times. During this interview,
when Ms. Spates was asking RT about how Plaintiff touched her, RT hesitated after saying that
her father touched her with one finger. Det. Cashman prompted RT by showing her his right
index finger, after which RT confirmed that Plaintiff touched her with that finger. Subsequent to
this interview, Det. Cashman sought a warrant for Plaintiff's arrest on five charges of criminal
sexual conduct in the second degree. On April 13, 2005, a magistrate judge approved the
warrant.

Plaintiff was brought to trial on January 19, 2006, after waiving his right to a preliminary
examination and a jury trial. RT testified at trial, during which she confirmed that she would
sleep in Plaintiff's bed because her room was cold and because she was scared of the dolls in her
room. She also stated that, while she was in bed with Plaintiff, he would ask her to rub his
stomach and then force her hand to move lower toward his genitals. RT testified that she tried to
pull away, but that Plaintiff was too strong. The area that she was forced to touch felt like a
"gushy ball." (R. 36-11, PageID #1716.) According to RT, Plaintiff made her touch him three
or four times. In addition, RT testified that Plaintiff touched her vagina, after unzipping her
"onesy" pajamas, on two occasions.

Plaintiff also testified at trial and made the following admissions: (1) he confirmed that
he had told Det. Cashman that he touched RT's vagina on at least three occasions; (2) during the
course of one weekend, Plaintiff applied ointment to RT's vagina six times, at the request of Ms.
Tatarly; (3) in response to RT's complaint of a stomach ache, he unzipped her pajamas, pressed
one finger on the top of her vagina, and pressed down to see if she felt any pain; and (4) his

Case 2:14-cv-13854-SFC-MJH   ECF No. 58   PageID.2892   Filed 11/17/16   Page 5 of 15 (5 of 15)
Case: 15-2495   Document: 54   Filed: 11/17/2016   Page: 5

No. 15-2495

Russian mother taught him that pushing down on a girl's vagina was a way to determine if she was sick.  Plaintiff again denied that he forced RT to touch his genitals.

 Finally, Det. Cashman testified at the trial and stated that Plaintiff admitted to him during an interview that he (Plaintiff) had touched RT's vagina.  Det. Cashman stated, however, that Plaintiff had never mentioned applying ointment, despite Plaintiff's testimony at trial.

After both sides had rested, the judge found Plaintiff guilty of three counts of criminal sexual conduct in the second degree—two counts based on Plaintiff's touching of RT and one count based on Plaintiff forcing RT to touch him.  Plaintiff was sentenced to four to fifteen years' imprisonment on each count, with the sentences to run concurrently.

Plaintiff appealed his conviction, but the Michigan Court of Appeals affirmed his conviction on March 27, 2007, and the Michigan Supreme Court denied Plaintiff's Application for Leave to Appeal on September 10, 2007.  On December 16, 2008, Plaintiff filed a motion for relief from judgment, which was denied.  The Court of Appeals denied leave for Plaintiff to appeal, but the Michigan Supreme Court found that the trial court should have conducted a hearing pursuant to *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), to determine whether Plaintiff was denied effective assistance of counsel.  Based on the evidence heard at this hearing, the trial court granted Plaintiff's motion because his trial counsel had been constitutionally ineffective.  The Court of Appeals reversed, but on December 21, 2012, the Michigan Supreme Court held that Plaintiff had, in fact, been deprived of his right to effective counsel.[2]  *People v.*

---

[2] Plaintiff repeatedly argues that Michigan Supreme Court in effect found that the evidence against him was insufficient to sustain a criminal conviction.  However, the court clearly vacated Plaintiff's conviction on the basis of ineffective assistance of counsel, which requires, for the prejudice prong, only a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Relief from judgment based on a claim of insufficient evidence, in contrast, requires the court to "view the evidence in a light most favorable to the

Case 2:14-cv-13854-SFC-MJH ECF No. 58 PageID.2893 Filed 11/17/16 Page 6 of 15
Case: 15-2495 Document: 34-2 Filed: 11/17/2016 Page: 6 (6 of 15)

No. 15-2495

*Trakhtenberg*, 826 N.W.2d 136, 147 (Mich. 2012). Plaintiff's criminal case was remanded to the trial court for a new trial. The Oakland County Prosecutor's Office, however, declined to prosecute Plaintiff and instead filed a Petition to *Nolle Prosequi* the charges because: (1) RT and Ms. Tatarly did not wish to relive the experience of the abuse; and (2) Plaintiff had already served seven years in prison, which was longer than the minimum sentence for the crimes.

Plaintiff filed this suit in state court against Det. Cashman in both his individual and official capacities, as well as against Oakland County, the Oakland County Sheriff's Department, and Sheriff Michael J. Bouchard in his official and individual capacities. The complaint alleges that Defendants violated Plaintiff's rights by violating the forensic interviewing protocols that were in place for conducting interviews of children who may have been abused. Specifically, Plaintiff alleges that Defendants violated the protocol that Michigan established, as part of its Child Protection Law, Mich. Comp. Laws. § 722.621 *et seq.*, in order to protect both children and those being investigated for child abuse or neglect. This protocol provides recommendations for, *inter alia*, interviewing children in order to avoid suggesting answers and insuring that the statements children give are reliable. Oakland County also established its own Child Sexual Abuse Investigative Protocol, which incorporates the state-wide protocol and provides additional instructions on investigating cases of child abuse. Defendants do not contest that Det. Cashman violated the protocols by asking Ms. Tatarly to question RT about alleged abuse and by holding up a finger to prompt RT to identify which finger Plaintiff used to touch her. Plaintiff alleges that, as a result of these protocols being violated, the evidence against him was fabricated.

---

prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992). Because the Michigan Supreme Court vacated Plaintiff's sentence based only on the lower standard for prejudice under an ineffective assistance of counsel claim, we cannot credit Plaintiff's argument that the court actually found that the evidence was also insufficient under the more burdensome test laid out above.

Case 2:14-cv-13854-SFC-MJH ECF No. 58 PageID.2894 Filed 11/17/16 Page 7 of 15
Case: 15-2495 Document 53-4 Filed: 11/17/2016 Page: 7 (7 of 15)

No. 15-2495

Based on these allegations, Plaintiff filed a complaint asserting fifteen counts against all Defendants. These counts included the following § 1983 claims (as identified by Plaintiff): False Arrest (Count I); False Imprisonment (Count II); Malicious Prosecution (Count III); Municipal Liability (Count IV); Supervisor Liability (Count V); Punitive Damages Individual Defendants (Count VI); Punitive Damages Individual Defendants (Count VII); and *Monell* Claim against Defendant Oakland County and Oakland County Sheriff's Department (Count VIII). The complaint also included various state law claims. Defendants removed the action to federal court on October 6, 2014.

After discovery was completed, Defendants filed two separate motions for summary judgment: one seeking summary judgment on the claims against Det. Cashman, and one seeking judgment on the claims against the other three Defendants. The district court granted both motions and granted judgment for all Defendants on all counts. Plaintiff timely appealed the judgment of the district court as to the § 1983 claims against Det. Cashman in his individual capacity.[3]

_____

[3] Plaintiff's notice of appeal indicated that he was appealing the district court's order as against all Defendants. Plaintiff, however, has failed to present argument relating to the district court's determination that the Oakland County Sheriff's Department is not an entity that can be sued. Similarly, Plaintiff failed to contest the district court's determination that Sheriff Bouchard is entitled to summary judgment in his individual capacity based on his lack of personal knowledge or involvement. Therefore, to the extent that Plaintiff intended to appeal the entry of judgment as to these Defendants, such claims have been waived. *See Buziashvili v. Inman*, 106 F.3d 709, 719 (6th Cir. 1997).

Plaintiff does not specifically argue that the district court erred in granting summary judgment to Oakland County, as well as to Det. Cashman and Sheriff Bouchard in their official capacities. However, if we find that Plaintiff's arguments on appeal regarding the claims against Det. Cashman in his individual capacity have merit, the district court's entries of judgment for Oakland County, Sheriff Bouchard, and Det. Cashman in his official capacity are also necessarily affected because the district court entered judgment for these Defendants based only on its earlier conclusion that Plaintiff had not established that Det. Cashman violated his constitutional rights. The court did not do any additional analysis regarding whether Plaintiff had established the elements for municipal liability claims. Consequently, the following analysis

7

## DISCUSSION

On appeal, Plaintiff challenges the district court's determination that Det. Cashman was entitled to qualified immunity for the § 1983 claims filed against him in his individual capacity for malicious prosecution, false arrest, and false imprisonment.

### A.      Standard of Review

This Court reviews a district court's grant of summary judgment *de novo. Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Id.*; Fed. R. Civ. P. 56(c).  When considering whether to grant summary judgment, all reasonable inferences must be made in favor of the non-moving party.  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case."  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986)).

---

applies to Plaintiff's claims against all Defendants except the Oakland County Sheriff's Department and Sheriff Bouchard in his individual capacity.

Case 2:14-cv-13854-SFC-MJH   ECF No. 58   PageID.2896   Filed 11/17/16   Page 9 of 15
Case: 15-2495   Document: 58   Filed: 11/17/2016   Page: 9   (9 of 15)

No. 15-2495

**B.     Analysis**

Public officials who violate a plaintiff's constitutional rights while acting under the color of law may be liable under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). However, the qualified-immunity defense bars individual liability where "a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

To determine whether an officer is entitled to qualified immunity, a court must determine "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). These two prongs of the qualified immunity test may be addressed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Plaintiffs bear the burden of showing that a clearly established right has been violated and that the official's conduct caused that violation. *See Chappell*, 585 F.3d at 907.

No. 15-2495

### 1.      False Arrest/False Imprisonment[4]

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).  When an arrest was made based on a facially valid warrant approved by a magistrate, defendants have a complete defense unless a plaintiff proves "by a preponderance of the evidence that in order to procure the warrant [the defendant] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (alterations in original) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)) (citing *Voyticky*, 412 F.3d at 677).  "If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Id.* (citing *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989)) (additional citations omitted).

Plaintiff argues that the warrant pursuant to which he was arrested was invalid because Det. Cashman, in seeking the warrant, included information that he "effectively falsified" by failing to adhere to the protocols for interviewing children who have been victims of sexual assault.  (Pl.'s Br. at 30–31.)  However, Plaintiff does not cite to any record evidence that shows that Det. Cashman purposefully or recklessly ignored the protocols in order to create incriminating evidence, as required for a false arrest and imprisonment claim.  In fact, the

---

[4] While false arrest and false imprisonment can be distinct claims, in this case they are the same and will therefore will be analyzed together. *See McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988) ("False arrest is synonymous with false imprisonment where one confines another purporting to act by authority of law which does not in fact exist." (internal quotation marks and citation omitted)).

uncontroverted record evidence reveals that Det. Cashman was not trained in any of the relevant protocols and may not have even been aware of some of the requirements. Therefore, even if interviewing RT in violation of the protocols resulted in "fabricated" evidence, Plaintiff has failed to prove that Det. Cashman acted with the requisite intent when conducting such interview and, thus, cannot establish that he was falsely arrested or imprisoned. *See Sykes*, 625 F.3d at 305 (explaining that, for a false arrest claim, the defendant must have "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" when procuring a warrant (internal quotation omitted)).

Moreover, as the district court found, probable cause still existed for Plaintiff's arrest even without the allegedly-tainted evidence. Probable cause existed based only on (1) the original statements of RT, which were first relayed to Ms. Allen of CARE House before Det. Cashman was involved in the case; and (2) Plaintiff's own statement that he had touched RT's vagina three times when she was in his bed with a stomach ache. Plaintiff claims that even this evidence was tainted because RT had talked to multiple people about the incidents of alleged abuse, even though the protocols recommended that multiple interviews not be conducted.[5] However, one of these interviews took place when Ms. Tatarly took RT to talk to a church pastor, before calling FIA or CARE House to report the abuse. This interview was conducted before any involvement by Defendants (including Det. Cashman) and was not done at the

___

[5] Plaintiff also claims that Ms. Spates did not follow the protocols but does not cite to any portion of the record to substantiate this claim. (Pl.'s Br. at 32.) However, it does not appear to make a difference in the analysis, as Ms. Spates' interview did not generate any of the evidence that the district court found was substantial enough to create probable cause.

direction of any Defendant.  Therefore, it cannot be that Det. Cashman "fabricated" evidence by arranging for this interview, thereby tainting RT's later statements.[6]

Plaintiff also claims that Ms. Allen's initial interview of RT was unreliable because Det. Cashman failed to inform Ms. Allen of relevant information, such as the fact that previously Ms. Tatarly erroneously reported Plaintiff's previous ex-wife Rima for abusing the son she (meaning Rima) shared with Plaintiff, and the fact that Ms. Tatarly and Plaintiff did not get along after a bitter divorce.  While Ms. Allen testified that such information may have been relevant when interviewing RT, Det. Cashman was not responsible withholding that information.  The interview notes reveal that Det. Cashman was not involved in the case until after Ms. Allen completed her interview, and Plaintiff provides no evidence to contradict this report.  Therefore, Det. Cashman could not have purposefully or recklessly created falsehoods that led to a finding of probable cause.  Consequently, the district court correctly granted summary judgment in favor of Det. Cashman as to Plaintiff's § 1983 false arrest and imprisonment claims against him in his individual capacity.

## 2.    Malicious Prosecution

This Court also recognizes a "'constitutionally cognizable claim of malicious prosecution under the Fourth Amendment'" encompassing "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006) (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)).  "The 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention

---

[6] Importantly, neither Plaintiff nor Defendants knew that RT talked to a pastor at the time of the criminal investigation.  This information was only revealed by Ms. Tatarly at the *Ginther* hearing.  *People v. Trakhtenberg*, 826 N.W.2d at 140.  Therefore, it cannot affect the determination of probable cause, as such an inquiry is made based on the information that officers had at the time.  *Sykes*, 625 F.3d at 306.

accompanied not by absence of legal process, but by *wrongful institution* of legal process.'"
*Sykes*, 625 F.3d at 308 (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)). "In order to
distinguish appropriately this claim from one of false arrest, we must consider not only
whether the Defendants had probable cause to arrest the Plaintiffs but also whether probable
cause existed to initiate the criminal proceeding against the Plaintiffs." *Id.* at 310–11 (citing *Fox
v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); and citing *Barnes*, 499 F.3d at 716).

The elements of a malicious prosecution claim under § 1983 when the claim is premised
on a violation of the Fourth Amendment are as follows:

> First, the plaintiff must show that a criminal prosecution was initiated against the
> plaintiff and that the defendant made, influenced, or participated in the decision to
> prosecute. Second, because a § 1983 claim is premised on the violation of a
> constitutional right, the plaintiff must show that there was a lack of probable
> cause for the criminal prosecution. Third, the plaintiff must show that, as a
> consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty
> . . . apart from the initial seizure. Fourth, the criminal proceeding must have been
> resolved in the plaintiff's favor.

*Id.* at 308–09 (internal quotation marks, citations, and alterations omitted).

Insofar as Plaintiff challenges the grant of summary judgment in favor of Det. Cashman
on the § 1983 malicious prosecution claim, we similarly affirm the district court's judgment. As
made clear already, there was probable cause at the time of Plaintiff's arrest, whether or not the
challenged aspects of the investigation were included. Plaintiff has not argued that any
information was acquired subsequent to the arrest that would indicate that initiation of the
criminal process was improper. *Id.* at 311 (stating that a claim for malicious prosecution exists
when, "viewing the totality of the circumstances at the time of the Plaintiffs' arrest and through
the time that the criminal proceeding against them commenced, a reasonable jury could have
concluded that there was no probable cause to believe that" the plaintiff committed a crime).

Therefore, based on the undisputed facts in the record and the lack of evidence put forth by Plaintiff, Det. Cashman was entitled to summary judgment on the malicious prosecution claim.

We therefore affirm the district court's entry of summary judgment in favor of Det. Cashman, in his individual capacity, on the § 1983 claims of false arrest, false imprisonment, and malicious prosecution because Plaintiff has not shown that Det. Cashman violated his constitutional rights. Consequently, Plaintiff's claims against Oakland County, Sheriff Bouchard in his official capacity, and Det. Cashman in his official capacity also fail based on the lack of a constitutional violation.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: November 17, 2016

Mr. Steven M. Potter
Potter, DeAgostino, Campbell & O'Dea
2701 Cambridge Court
Suite 223
Auburn Hills, MI 48326-0000

Ms. Liisa R. Speaker
Speaker Law Firm
230 N. Sycamore Street
Lansing, MI 48933

Re: Case No. 15-2495, *Yakov Trakhtenberg v. County of Oakland, et al*
Originating Case No. : 2:14-cv-13854

Dear Counsel,

The Court issued the enclosed (Order/Opinion) today in this case.

Sincerely yours,

s/Robin Baker
Case Manager
Direct Dial No. 513-564-7027

cc: Mr. Robert C. Clark
Mr. Rick J. Patterson
Mr. David J. Weaver

Enclosure

Mandate to issue